IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JUAN SALAZ,

        Petitioner,

v.                                    CIV 04-127 WJ/KBM

PATRICK SNEDEKER, Warden, et al.,

        Respondents.

# PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Petitioner Juan Salaz pleaded guilty to aggravated battery and, in an unrelated but consolidated case, pleaded guilty to three counts of attempted criminal sexual penetration of a minor and ten counts of criminal sexual contact with a minor. After suspending twenty years of his sentence, the state court sentenced Petitioner to forty years imprisonment. *See e.g., Record Proper 99-2174 at 63-69, 71; Plea Transcript 8/7/00 (hereinafter "Plea") at 4, 25; Sentencing Transcript 11/16/00 (hereinafter "Sentencing") at 48.*

After his request to reconsider sentence was denied, Petitioner commenced state habeas proceedings. Following motions and evidentiary hearings, the state court denied relief. The New Mexico Supreme Court denied certiorari on August 7, 2003. *See, e.g., Doc. 9,* Exhs. G-H; *Record Proper 99-2174 at 117-25, 150-56; Record Proper 00-1029 at 41-42, 147-48; Reconsider Sentence Transcript 5/14/01 (hereinafter "Reconsider Sentence") at 66; Motion Transcript 7/8/02 ("Habeas Motion"); "Motion" Transcript 2/18/03 ("Robinson Habeas Testimony"); Evidentiary Hearing Transcript 5/2/03 ("Schoeppner Habeas Testimony"); Evidentiary Hearing Transcript 6/10/03 ("Petitioner Habeas Testimony").*

Petitioner mailed his *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 on February 3, 2004, and it was filed in federal district court on February 5, 2004. *See Doc. 1* (and accompanying envelope). He contends that his plea was involuntary because his trial attorneys promised that the trial judge agreed to give him a sentence of zero to four years with probation. *Doc. 1* at 5; *see also id.* ("Statement of Supporting Facts" at 1). He also asserts a number of instances where his trial attorneys allegedly rendered ineffective assistance of counsel. *Id.* at 5; *see also id.* ("Statement of Supporting Facts" at 1-12). Finally, he maintains that his attorney who pursued a motion to reconsider sentence also rendered ineffective assistance. *Id.* ("Statement of Supporting Facts" at 12).

Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., Michael Williams v. Taylor,* 529 U.S. 420, 429 (2000); *Lindh v. Murphy,* 521 U.S. 320, 326-327 (1997). All of the issues can be resolved on the record and, therefore, an evidentiary hearing is unnecessary. *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 531 U.S. 835 (2000); Rule 8(a), *Rules Governing Habeas Corpus Under Section 2254.* Having thoroughly and carefully reviewed the voluminous record, I find Petitioner's claims without merit under the applicable standards, and recommend that his § 2254 petition be dismissed with prejudice.

# I.  Factual Background

To appreciate the context from which Petitioner's habeas claims arose, and because Petitioner's pleadings often misrepresent the actual record, I will discuss the incidents, charges, plea and motion for reconsideration now in some detail. I discuss the post-conviction proceedings in the analysis sections.

## A. Petitioner's Employment Status And Relationships Preceding The Incidents

Salaz is a former postal worker who was fired from his job sometime shortly before the events at issue took place.[1]  Petitioner asserts that after losing his job, he hired attorney Shannon Robinson to "help[] [him] collect [his] retirement money from the post office."  *Doc. 1* ("Statement of Supporting Facts" at 4).  Salaz also asserts that he became severely anxious and depressed and was taking antidepressants at that time.[2]

In September 1998, Petitioner met his girlfriend, Linda Davis.  Davis' children, one of whom was a twelve-year old daughter named Sharon, called Petitioner by the name "Bob."  *See, e.g., Doc. 1* ("Statement of Supporting Facts" at 2-3, 5); *Davis Police Interview* at 6, 12, 16-17; *Schoeppner Habeas Testimony,* Exh. E (hereinafter "*Safe House Video*").  Salaz asked Davis to marry in October, told Sharon he wanted to adopt her, and Davis and Sharon moved into Petitioner's home in mid-November.  *See Doc. 1* ("Statement of Supporting Facts" at 2-3, 5); *Davis Police Interview* at 5-6, 12-13, 25, 26-27, 44.

Sharon previously had suffered sexual abuse by her brother and another of her mother's boyfriends and underwent two years of therapy between 1994 and 1996.  During counseling Davis was told that she may have to periodically take Sharon back to counseling to help Sharon

---

[1]  *See, e.g., Record Proper 00-1029* at 83 ("Petitioner, a recently fired former long-time postal employee with virtually no prior criminal record, was indicted for serious felonies in two separate cases."); *Schoeppner Habeas Testimony,* Exh. D (hereinafter "*Davis Police Interview*") at 19 (Salaz "was unemployed because he was terminated from the post office."); *Sentencing* at 41 (Petitioner was "terminated from the postal service in 1998").

[2]  *See Doc. 1* ("Statement of Supporting Facts" at 11) ("The loss of Petitioner's 18 year postal career created depression and anxiety in him, for which he sought counseling.  His medication was changed and adjusted several times, but no improvement was noticed.  Petitioner could not afford to proceed with counseling."); *Davis Police Interview* at 17 (Petitioner taking Prozac for "anger management").

deal with anger.  During the time that Petitioner and Davis met and moved in together, Sharon was in an unstable environment, ans she was angry, was going through puberty, and was performing badly in school.  According to Petitioner, he was aware of Sharon's past, but nonetheless hoped to become a successful stepfather to her.

During the summer of 1998, just months before Petitioner met Davis and her family, Salaz developed a contentious relationship with a man named Jose Armijo.  Among other things, Petitioner asserts that Armijo stole from him and stalked him for months.  On November 26, 1998, Salaz and Armijo had an altercation, and both suffered injuries that required treatment at the hospital.  Petitioner's young sons were with him at the time.  Salaz and Armijo gave differing versions of the events.  Petitioner claimed that Armijo was the initial aggressor and that Salaz had responded only in self-defense.

## B.  The Assault Charges

Salaz was arrested for stabbing Armijo the day after the altercation.  On Salaz' behalf, Davis approached attorney Shannon Robinson to retain his services for Petitioner on that criminal matter.  Soon thereafter, Petitioner was released on bond, and he, Davis, and Sharon encountered Robinson on the street outside the attorney's office.  Robinson was introduced to Sharon and spoke with her briefly about school and sports – approximately thirty seconds.  Robinson's impression of Sharon was that she was smart, a little shy, and nice.  *See Record Proper 00-1029* at 83-85; *Robinson Habeas Testimony* at 19-21, 34, 46-49, 54-55, 72-73, 88; *Doc. 1* ("Statement of Supporting Facts" at 2-4); *Davis Police Interview* at 12, 16-17, 19, 20.

At some point in 1998, Petitioner was indicted for the Armijo assault and charged with six counts:  aggravated battery, attempted second degree murder, false imprisonment, tampering, and

two counts of third degree child abuse for allowing his children to witness the event.  That

indictment was later dismissed without prejudice because of an "*Ulibarri*" problem.[3]  The case

was reindicted in April 2000 and assigned to Judge Diane Dal Santo.  *See Record Proper 00-1029*

at 1-4.

## C.  The Child Abuse Charges

Meanwhile, on Sunday, January 10, 1999, Davis had begun packing up her things because

of her "on again, off again" relationship with Petitioner.  However, neither she nor Sharon left the

house at that time.  On Thursday, January 14, 1999, Davis arrived home to find that Petitioner

and Sharon had been fighting.  Petitioner complained that Sharon hit, pinched, and kicked him.

Davis was angry with Sharon and was about to reprimand her when Sharon said, "he stuck his

penis in my butt mom."  Petitioner swore he did no such thing.  *See Davis Police Interview* at 3-7,

9-10.

At that point Davis did not know who to believe.  Given Sharon's past abuse, her recent

unstable environment, and that Sharon seemed to like Petitioner, Davis neither wanted to falsely

accuse Salaz nor give Sharon the impression that she did not believe her.  Therefore, Davis

thought the best way to deal with the situation was to involve a counselor, and she called on

Friday, January 15, 1999 to schedule an appointment.  Davis thought that if there had been sexual

---

[3]  On October 20, 1999, the New Mexico Court of Appeals held that the practice of giving the grand jury a manual containing uniform criminal jury instructions was insufficient and that, at the very least, prosecutors are required to establish on the record that they instructed the grand jurors on the elements of the crime at issue.  If the prosecutor failed to do so, dismissal of the indictment without prejudice was required.  On February 1, 2000, the New Mexico Supreme Court affirmed and denied rehearing a month later.  *State v. Ulibarri,* 128 N.M. 686, 997 P.2d 818, 997 P.2d 818 (N.M. 2000).  Consequently, all of the effected cases in the Second Judicial District were dismissed without prejudice and, in some instances, reindicted.  *E.g., Record Proper 00-1029* at 1; *Record Proper 99-2174* at 1-6, 54-56.

abuse on the part of Petitioner, Sharon would reveal it during counseling.  *See id.* at 5-8, 35-37.

Sharon and Davis attended counseling together the following Monday.  However, they only discussed Sharon's past abuse and made no mention of any allegations regarding Petitioner. *Id.* at 8-9.  The next evening, Sharon told Davis that while playing backgammon with Petitioner, they started wrestling and he sat on top of her and touched her breast over her clothes.  When Davis confronted Petitioner, he related that they were wrestling because Sharon was kicking him and that the touching was an accident.  Sharon accused Petitioner of lying and purposely touching her.  A verbal fight ensued as Petitioner accused Davis and Sharon of using him and told them to leave the house the next day.  Davis screamed at Petitioner, calling him a "pervert," and telling Sharon to call the police.  *Id.* at 2-3, 9-10.  Before the police arrived, Petitioner allegedly asked Sharon "continue" to be his "girlfriend" and then left the scene.  *Id.* at 11, 38.

When the officers came, Davis and Sharon related the allegations to them, and the officers made an appointment for Sharon to be interviewed at "Safehouse" the following week.  *See Schoeppner Habeas Testimony,* Exh. C at 2-5 (if separately-numbered) (hereinafter "*Police Report Summary*").  During Sharon's taped interview, she told the counselor that her deceased grandmother and grandmother's dog had "come down to earth" and that she saw them.  She also related details about numerous instances of abuse and/or sexually suggestive conduct by Petitioner.  She said that Salaz had asked her to marry him.  *See Safe House Video.*  Just after Sharon's interview, the police audio-recorded Davis' statement.  *See Police Report Summary* at 3 ("After the Safehouse interview, I spoke to Linda Davis, which was audio-recorded.").

They then called Petitioner and left a message for him to call the police, but he did not return the telephone calls.  *See id.* at 4.  Instead, Salaz had both his cousin and attorney Robinson

call to inquire what the police wanted.  The officers briefed Robinson about the investigation.

Over the next two weeks, the officers unsuccessfully tried to coordinate an interview either with

Petitioner, or with Petitioner in Robinson's presence.  Eventually, Robinson advised the police

that Salaz would not agree to an interview and that the officers should submit the case to the

District Attorney.

The police therefore forwarded the matter to the "District Attorney's office for review and

possible prosecution," apparently on February 18, 1999.  *See id.* at 4-5.  On June 21, 1999,

Petitioner was indicted on fifteen counts:  three counts of criminal sexual penetration of a child,

ten counts of criminal sexual contact with a minor, and two counts of attempted criminal sexual

contact.  *See Record Proper 99-2174* at 1-5.  The case was initially assigned to Judge Ross

Sanchez.  *See id.* at 7.

Robinson was involved as Petitioner's attorney from the outset of the molestation

investigation.  At some point, he asked attorney John Schoeppner to help because of his greater

experience in child abuse cases.  The attorneys and Petitioner could not recall exactly when this

occurred, but Petitioner recalled talking to both of them after the indictment was filed.  State

court records indicate that Schoeppner was counsel of record as of Petitioner's July 2, 1999

arraignment, at which time Petitioner was released on bond.  *See id.* at 8-11; *Schoeppner Habeas

Testimony* at 6; *Robinson Habeas Testimony* at 23-24; *Petitioner's Habeas Testimony* at 9-10.

The case was originally set for a pretrial conference in October 1999 and trial in

November 1999.  *Record Proper 99-2174* at 12.  However, there is no record of any pretrial

conference, and there is no indication of what happened at "docket calls" in November and

December.  *See id.* at 13-20; *id.* (docket sheet entry 11/9/99 and 12/7/99).  Instead, in December

1999, the parties moved for an extension of time to allow them to prepare for trial which was granted. *See id.* at 21-33, 35.  In February, the parties again petitioned the New Mexico Supreme Court for an additional extension of time to September 2000 because they were negotiating an anticipated plea. *See id.* at 34-35, 37, 52.  The Court granted the request. *Id.* at 53.

Thereafter, the defense took two actions in March 2000.  First, Schoeppner moved to dismiss the child abuse indictment based on the same *Ulibarri* problem that resulted in dismissal and reindictment of the Armijo assault charges.  That motion was never ruled on. *Id.* at 54-56.  Second, they sent Petitioner to Dr. Moss Aubrey for a psychological evaluation.

### D.  Dr. Moss Aubrey's Psychological Assessment

Dr. Moss Aubrey has a Ph.D. in psychology, and specializes in forensic clinical psychology, which he defined as "evaluation of persons who have been involved with various court systems," with "the majority of [his] assessment work . . . with persons accused of sexually offensive behavior, both juveniles and adults." *Reconsider Sentence* at 6.  Dr. Aubrey performs evaluations for both the prosecution and defense, as well as at the request of the courts. *Id.* at 7.  Among other things, one of the "basic questions" that Dr. Aubrey addresses in his evaluation is the "degree of risk [offenders] pose if they are in the community [and their] potential to re-offend." *Id.* at 7.

Dr. Aubrey evaluated Petitioner in March 2000 and issued his report two months later. *See id.* at 7, 16.  The report is not in the record, but Dr. Aubrey's diagnostic tools and findings are apparent from comments of the parties and Court at the sentencing hearing, as well as from his own testimony at the reconsideration hearing.

Dr. Aubrey ran a series of tests, some of which have "validity indicators."  He found

8

Petitioner was neither minimizing nor under-reporting, and he felt Salaz was both candid and believable.  *See Sentencing* at 29-31; *Reconsider Sentence* at 24-25.  Dr Aubrey diagnosed Petitioner with "emotional problems," and a "borderline personality disorder," which is "notoriously associated with poor boundaries in general, poor sexual boundaries being part of that volatility, misreading situations, having poor judgement."  He further noted that "Mr. Salaz has had previous inappropriate sexual behavior in regards to harassment and work settings."  *Reconsider Sentence* at 8.[4]

Dr. Aubrey was of the opinion that Petitioner (1) would be a "good candidate" for, and would respond "positively" to and benefit from, treatment, and (2) was a "low to moderate" risk of reoffending.  *See Reconsider Sentence* at 9, 10, 12, 25-26.[5]  He also believed Petitioner "is a man who potentially can be placed in the community on probation or parole and treated there, and that's an important consideration because there is no treatment [provided to sex offenders while incarcerated]."  *Id.* at 10.

---

[4]  *See also Sentencing* at 34 (Petitioner has borderline personality disorder, low self-image and self-worth, and is educated and smart); *id.* at 43 (" Dr. Aubrey said that Mr. Salaz presented with a general tone of being narcissistic, defensive about his responsibility for his problems over many years.  He does address that there's an anxiety disorder and depression which results in chronic problems with anger.").

[5]  He identified four factors that lead him to this conclusion.  First, although Petitioner did not take "100 percent responsibility" in that there was "some discrepancy between his account and the victim's account" of the abuse, Petitioner was "much better than the typical sex offender" in terms of disclosing, and taking responsibility for, what happened.  *Reconsider Sentence* at 9.  Second, Petitioner was not "predatory" in nature – rather, he is  "opportunistic."  *Id.* at 14-15.  That is, his behavior "seems to be more of reaction to issues and opportunities and situations that arose without his orchestrating in a thoughtful manner."  *Id.* at 18.  Third, based on the tests Dr. Aubrey administered, Petitioner "doesn't show the other features that are actually more prognostic of serious violence or sexually violent behavior in the future."  *Id.* at 10.  Instead, based on models of similarly situated offenders and rates of reoffense, Petitioner would be in the 10-20% range for reoffending without treatment, and possibly lower with treatment.  *Id.* at 12-14, 26.  Finally,  Petitioner was already being treated with the particular antidepressant that is used for sex offenders, and one of the side effects of that medication is a reduction of sex drive.  *Id.* at 26-27.

It is not clear, however, that Dr. Aubrey's opinion about the appropriate sentence was part of his written report. For example, as characterized by the prosecutor, the last two pages of Dr. Aubrey's report recounting Petitioner's past behavior conveys concern about possible future behavior. *Id.* at 17. Those recommendations included that Salaz have no contact with children of any gender and submit to routine polygraph testing. *See id.* at 20; *Sentencing* at 43-44; *Reconsider Sentence* at 18. As noted by Judge Dal Santo at sentencing, Dr. Aubrey's report of Petitioner's vocational history illustrated a pattern of inappropriate behavior:

> Mr. Salaz describes his termination from the postal service was the result of his hitting a co-worker, which he described as a result of the co-worker hitting him repeatedly over a period of time. And although Mr. Salaz filed complaints, nothing was done about it and he eventually struck back, so he was terminated from the postal service in 1998.
>
> Prior to that, he had worked for seven years as a maintenance worker for the telephone company and he was fired from that job because he kissed an adult female customer while he was installing her phone. While he was at the postal service he apparently displayed anger control problems, had an argument with a supervisor which he claimed was fabricated against him and that was apparently about Mr. Salaz' sexually harassing co-workers and customers that were female. He was terminated from a job selling cars after he pointed out a mistake made by a co-worker. He was terminated from another job when he was performing sales for termite and pest control service because he asked out a female customer . . . . [These incidents] show a pattern of behavior that's inappropriate and inappropriate sexually in some cases, and involve some violence or some – certainly some very misplaced anger.

*Sentencing* at 41-42.

### E.  Consolidation

In April 2000, Petitioner was arraigned before Judge Dal Santo on the newly-filed indictment setting forth the assault charges with respect to the Armijo altercation.  *See Record Proper* 00-1029 at 1-10.  The molestation indictment was neither dismissed nor reindicted because of the *Ulibarri* problem.  By August 7, 2000, the parties reached a plea agreement that encompassed both sets of charges.  Accordingly, the two cases were consolidated and the child abuse charges proceeded by information.  *See Record Proper 00-1029* at 11-22; *Record Proper 99-2174* at 57-62.

### F.  Plea Before Judge Dal Santo

#### (1)  Written Agreement Dated August 7, 2000

Ultimately, a number of charges were dismissed against Petitioner, including the attempted murder charge.  Petitioner pleaded guilty to third degree aggravated battery for the Armijo incident, as well as three counts of ***attempted*** criminal sexual penetration and ten counts of third degree criminal sexual contact as to Sharon.  *See, e.g., Record Proper 99-2174* at 63-69 (emphasis added).

The written plea agreement specifically explained the basic sentence of incarceration for each of the felonies to which Petitioner pleaded guilty.  Those basic sentences amounted to sixty years imprisonment.  *E.g., id.* at 65-67.  The agreement also explained that "[a]ny basic sentence for a felony may be altered up to one third for aggravating or mitigating circumstances."  *Id.* at 67.  However, Petitioner's agreement allowed probation as an option, and imposed a fifty-year

"cap"on any potential term of incarceration that a judge might impose.[6]

Petitioner specifically waived any appeal if the court's sentence was "imposed according

to the terms of this agreement." *Id.* at 68. He signed the plea agreement following the paragraph

---

[6]   Specifically:

> SENTENCING AGREEMENT: There are no other sentencing agreements other than the following: The parties agree that the sentences for each of the above counts will be run consecutively, there is a cap at initial sentencing of 50 (fifty) years; if any portion of the sentence is suspended or deferred the defendant shall be required to:
>   a. Enter and successfully complete Sex Offender Treatment;
>   b. Have no contact with [the] victim;
>   c. Agrees to be tested for sexually transmitted diseases . . .
>   d. Pay restitution . . .
>   e. Pay (reimburse) for victim's counseling . . .
>   f. Register as a sex offender . . .

> All of the above conditions shall be imposed as conditions of parole. The state and the defendant further agree that there will be no Conditional Discharge in this case.

> This offer is based on your client having no prior felony convictions.

> * * * * *

> POTENTIAL INCARCERATION: If the court accepts this agreement, the defendant may be ordered to serve a period of incarceration of between 0 (zero) and up to 50 (fifty) years, at initial sentencing. The defendant may also be ordered to serve a period of probation. If the defendant later violates that probation, he may be incarcerated for the balance of the sentence.

*Record Proper 99-2174* at 65, 67.

In other words, the cap will become inapplicable if Petitioner violates probation or parole:

> CAP: Any "cap" or other limitation in incarceration shall be a limitation on imprisonment only at initial sentencing. If the defendant violates any condition of parole or probation, the court may sentence him to imprisonment without consideration the limitations.

*Id.* at 67.

12

that read in part:  "I have read and I understand this agreement. . . .  I have discussed the case and my constitutional rights with my lawyer. . . .  I understand that if the court grants me probation . . . the terms and conditions of the sentence are subject to modification if I violate any of the terms or conditions imposed."  *Id.*

### (2)  Plea Colloquy That Same Day

Judge Diane Dal Santo also took the plea on August 7, 2000.  After ascertaining the counts to which Petitioner was pleading guilty, Judge Dal Santo asked about any sentencing agreement:

> THE COURT:  Is there -- and I think you said earlier, Ms. Bonachea [the prosecutor], that there is no sentencing agreement.
> MS. BONACHEA:  There's no sentencing agreement.  That's correct.  ***Total exposure on the face of the plea and disposition agreement is 60 years.  The agreement is that at initial sentencing it will be capped a zero to fifty.***
> THE COURT:  Is that also your understanding, Counsel?
> MR. SCHOEPPNER:  Yes, Your Honor.

*Plea* at 10-11 (emphasis added).

She then established that Petitioner understood the rights he was waiving by pleading guilty:

> THE COURT:  Okay.  Mr. Salaz, a few minutes ago I asked you to raise your right hand and I gave you an oath to tell the truth.  Is that correct?
> THE DEFENDANT:  Yes, ma'am.
> THE COURT:  Also at that time I advised you of your rights and the rights that you give up when you plea.[7]  Is that correct?

---

[7]  That is:

> THE COURT:  . . . If you are pleading today, it's important that you understand that when you plea, you give up certain constitutional rights that you would otherwise have.

THE DEFENDANT:  Yes, Your Honor.
THE COURT:  Did you understand those rights?
THE DEFENDANT:  Yes, I did.
THE COURT:  Do you understand that you give them up by pleading today?
THE DEFENDANT:  Yes, Your Honor.

*Id.* at 11.

She scrupulously questioned Petitioner about whether he understood the terms of the plea agreement, including the sentencing provision:

THE COURT:  As I understand it, you are here today to plead guilty to 14 different counts, felony counts.  Is that correct?
THE DEFENDANT:  Yes, Your Honor.
THE COURT:  ***And do you understand that for you plea, that you could go to prison for as many as 60 years?***
***THE DEFENDANT:  Yes, Your Honor.***
***THE COURT:  I understand that you and the state have agreed that the maximum sentence you would face at initial sentencing would be 50 years.  Is that correct?***

_____

And these rights include the right to a speedy, public trial by a jury and the right to appeal any conviction.  At a trial, you'd have the right to confront and cross-examine the witnesses that the state would call to testify against you, and you would have the right to testify and have witnesses come to court and testify on your behalf.

Additionally, you would have the right to remain silent and the right to a presumption of innocence.  All of these rights you give up when you plea.  So it's important that you understand the rights and that you understand that you're giving them up.

When you come back up here, I'm going to ask you if you understood your constitutional rights.  If there's something that's raised – we use a lot of legal language – and you're not quite here sure what it means, please let me know.

Also when you plea, you give up the right to claim that any violation of your constitutional rights.  So if you think that the police violated your constitutional rights at any time during the investigation of this case or your arrest, it's important you understand that you give up that right when you plea.

*Plea* at 2-3; *see also id.* at 12-13 (separately advising of right to preliminary hearing and presentation to grand jury of certain counts and that he understood the rights and was waiving them).

> *THE DEFENDANT:  Yes, Your Honor.*
> *The Court:  So do you understand that, as you stand before the Court today pleading guilty, this Court could initially sentence you to 50 years or at some subsequent time sentence you to a total sentence of 60 years?*
> *THE DEFENDANT:  Yes, Your Honor.*
> *THE COURT:  And knowing that, do you wish to continue with your plea?*
> *THE DEFENDANT:  Yes, Your Honor.*
> THE COURT:  Did you read this plea and disposition agreement.
> THE DEFENDANT:  Yes, Your Honor.
> THE COURT:  Did you review it with your attorney?
> THE DEFENDANT:  Yes, Your Honor.
> THE COURT:  And did you sign it after that?
> THE DEFENDANT:  Yes, Your Honor.
>
>                                    * * * * *
>
> THE COURT:  Okay.  Also on this plea agreement, there's a signature on the second to the last page that appears to be yours.  Can you see that, Mr. Salaz?
> THE DEFENDANT:  Yes, Your Honor.
> THE COURT:  Is that your signature?
> THE DEFENDANT:  Yes, Your Honor.
> THE COURT:  Did you sign this agreement?
> THE DEFENDANT:  Yes, Your Honor.

*Id.* at 11-13.

Equally scrupulously, she questioned Petitioner about whether he entered into the agreement voluntarily and was competent to do so:

> THE COURT:  Did anybody force you or threaten you in any way to get you to plead guilty today?
> THE DEFENDANT:  No, Your Honor.
> *THE COURT:  Has anybody promised you anything other than what's been stated here in open court?*
> *THE DEFENDANT:  No, Your Honor.*
> THE COURT:  Are you pleading voluntarily and of your own free will?
> THE DEFENDANT:  Yes, Your Honor.

* * * * *

     THE COURT:  Are you under the influence of any alcohol or drugs today?
     THE DEFENDANT:  No, Your Honor.
     THE COURT:  Are you taking any medication?
     THE DEFENDANT:  No, Your Honor.
     THE COURT:  ***Is there any reason you cannot completely understand these proceedings?***
     ***THE DEFENDANT:  No, there isn't, Your Honor.***

* * * * *

     THE COURT:  I may be backtracking.  Are you under the influence of any alcohol or drugs today?
     THE DEFENDANT:  No, ma'am.  No, Your Honor.
     THE COURT:  Are you taking any medication?
     THE DEFENDANT:  No, Your Honor.
     THE COURT:  Is there any reason you cannot completely understand these proceedings?
     THE DEFENDANT:  No, Your Honor.

*Id.* at 13-15 (emphasis added).

Judge Dal Santo also undertook a lengthy inquiry to ascertain Petitioner's plea to every count.  She read each count separately, stopping immediately after reading the particular count to question Petitioner.  Without fail or hedging, Petitioner pleaded "guilty" to each count, admitted that the facts she had just read from the count were true, and that, "yes," he committed the acts described in the count.  *See id.* at 15-24.

Finally, Judge Dal Santo questioned Petitioners and his attorneys:

     THE COURT:  Have you discussed this matter thoroughly with your attorney Mr. Robinson and your attorney Mr. - -
     MR. ROBINSON:  Schoeppner.

* * * * *

     THE COURT: . . . Are you satisfied with the advice that you've

16

received from them?

    THE DEFENDANT:  Yes, Your Honor.

    THE COURT:  Counsel, do you concur in your client's plea?

    MR. SCHOEPPNER:  I do, Your Honor.

    MR. ROBINSON:  Yes, Your Honor.

    THE COURT:  And terms and conditions of the plea agreement?

    MR. ROBINSON:  Yes.

    MR. Schoeppner:  Yes, Your Honor.

    THE COURT:  Are you satisfied that there – that your client's constitutional rights have not been violated?

    MR. SCHOEPPNER:  I'm so satisfied, Your Honor.

    MR. ROBINSON:  Yes.

*Id.* at 24-25.

Accordingly, Judge Dal Santo accepted the plea and ordered a presentence report.  *Id.* at 25.

## G.  *Sentencing Before Judge Dal Santo*

The presentence report recommended that Judge Dal Santo sentence Petitioner to sixty years and suspend ten years of that sentence pursuant to the plea agreement.  *See Sentencing* at 2. The State concurred with the recommendation, in part because the abuse had traumatized Sharon and also because Petitioner had minimized and rationalized his behavior in his interview for the presentence report.  The State maintained that his behavior and statements in the interview was evidence that Petitioner was likely to re-offend and was a danger to children.  The State also noted that Petitioner's attack on Armijo was violent and took place in the presence of Petitioner's sons.  *See, e.g., id.* at 7-13, 39-40.

Conversely, Robinson and Schoeppner argued that the plea agreement gave the judge a wide range of sentencing "from zero to 50," *id.* at 14.  They argued that Judge Dal Santo should sentence Petitioner to three years of incarceration followed by a long and restrictive period of

17

probation that included therapy, *id.* at 35-36.  In support of their position, they raised several

principle arguments.

First, the defense contended that Petitioner had taken "full" responsibility and

accountability for the crime.  Petitioner himself told the Court:

> Your Honor, I'd like to address the Court from the bottom of my
> heart that I understand that I have committed a serious crime.  I've
> had a lot of time to think about what I've done and it caused harm
> to others.  I also would like to – I am also asking forgiveness of all
> people that have been harmed.  I would also like to express that
> ***I've committed this crime*** that has caused me a lot of torture and
> grief throughout my year and a half pondering, going over and over
> in my mind this incidence (*sic*) and I would – I will suffer the rest of
> my life because of it.  And ***it tortures me to think about the actions***
> ***that I have caused and I ask mercy of you,*** Judge.  Thank you.

*Id.* at 13 (emphasis added).  Moreover, Schoeppner told the judge that Petitioner's insistence on

taking full responsibility from early on was to such a degree that in its absence, counsels' handling

of the case might have been deemed ineffective.

> MR. SCHOEPPNER: . . . Your Honor, he has taken full
> responsibility, full accountability so much so that when I was
> talking to Mr. Salaz about how these types of cases are tried and
> what types of things are necessary, what types of hearings we have,
> what types of contact that I would have to have with that little girl,
> interviews and her testimony, ***he said, "I don't want to hurt this***
> ***girl any more."***  So almost to the point of – which, you know, it's
> almost ineffective if the Court – what the Court is going to state
> things that we did do those things.  I didn't have contact with her.
> I didn't have to bring her therapist here and do *Daubert* and
> *Alberico* motions.  And there's some – there's some evidence in
> what I've read that there's even –  I think we had good reason to
> file fo[]r motions for an evaluation of the girl.  ***We didn't do any of***
> ***these things.  Mr. Salaz wanted to take full responsibility, all the***
> ***way down the line.  I think Mr. Chambreau will tell you that.***
> ***Dr. Moss Aubrey told you that.  I want the Court to note that.***

*Id.* at 14-15 (emphasis added).

Second, regarding the sexual offenses, counsel called Mr. Bill Chambreau to testify.  He

conducted a number of "sessions" with Petitioner beginning in September 2000.  *See Sentencing*

at 16; *Reconsider Sentence* at 29, 42.  Chambreau, a former public defender, was apparently well

known to the judges, so his qualifications were never discussed.  *See id.* at 16; *Reconsider*

*Sentence* at 29.  As best I can tell from this record, he is not a therapist, but serves in some

capacity with New Mexico's sex offender program.  *See Reconsider Sentence* at 36-37; *see also*

*Schoeppner Habeas Testimony* at 61 ("Chambreau; I don't think he's a doctor").

Based on Dr. Aubrey's findings and his own sessions with Petitioner, Chambreau opined

that Petitioner was a good candidate for treatment and rehabilitation with a low-to-moderate

likelihood of recidivism if he was able to participate in therapy soon.  *See Sentencing* at 16-23.

This was so, according to Chambreau, because Petitioner was "forthcoming, which is extremely

rare," "admitted what he did," "took responsibility for his behavior," realized that he has a

problem that needs treatment, and had not been diagnosed as predatory or a pedophile.  *Id.* at 17-

18.

Because the State had discontinued providing such services to prisoners, Chambreau

testified that if Petitioner received a long sentence, any therapy he could receive later essentially

would be useless.  The "window of opportunity" for effective treatment for Petitioner was sooner

rather than later.  *See id.* at 21-22; *see also id.* at 22 ("if we're talking about a long period of time,

it really kind of nullifies what we can do. . . .  We know that treatment works.  We know that

treatment works with this type of an offender.  So we can substantially lower the recidivism

rate.").

Both Chambreau and counsel provided Judge Dal Santo with explanations for Petitioner's

"minimization" during the presentence interview.[8]  Finally, focusing on Plaintiff's diagnosis as an

"opportunist" rather than "predator," counsel asked the judge to consider the unique confluence

of events that preceded Petitioner's sexual abuse of Sharon:  a postal worker, who has problems

with anger, who had been on Prozac for years, who loses his job just before retirement, who has a

basis for believing that another man is stalking and stealing from him, and begins a rocky

relationship with the mother of a daughter who has been abused before.  *See id.* at 23-35.

At the end of the November 16, 2000 hearing, Judge Dal Santo imposed a total of forty

years imprisonment, noting the portions of Dr. Aubrey's report concerning work history and

restrictions discussed earlier.  *See id.* at 48; *see also Reconsider Sentence* at 55.

## H.  New Judges, New Counsel, And Entry of Judgment

A judgment and sentence order was not entered immediately after Judge Dal Santo's

sentencing hearing.[9]  *See Record Proper 99-2174* at 75; *Record Proper 00-1029* at 29.

Apparently, she retired a few days after sentencing.  *See Schoeppner Habeas Testimony* at 77.

As of December 1, 2000, Judge Mark Maracon was assigned both of the cases.  *See*

*Record Proper 99-2174* (docketing sheet); *Record Proper 00-1029* (docketing sheet).  He was

---

[8]  Chambreau essentially testified that he was not surprised at such behavior in an interview with a
probation officer because, "minimization has to be treated," and Petitioner had not received any
"treatment" at that point.  *Sentencing* at 17.  Robinson indicated that he was surprised at the
"minimization" paragraph in the presentence report and had actually questioned Petitioner about it.
Petitioner told Robinson that he was involved in an altercation the day before the interview and was beaten
up – as a result, he went into the meeting confused and disoriented.  *Id.* at 26.  In contrast to the probation
report, Robinson told the Court that "any time" he talks to Salaz, he "admits exactly and precisely what he
did."  *Id.* at 26-27.

[9]  Under New Mexico law, an "oral pronouncement is not a final judgment and is subject to change
until reduced to writing."  *State v. Rushing,* 103 N.M. 333, 334, 706 P.2d 875, 876 (N.M. App.) (citing
*State v. Diaz,* 100 N.M. 524, 673 P.2d 501 (1983), *cert. denied,* 469 U.S. 1016 (1984)), *cert. denied*, 103
N.M. 344, 707 P.2d 552 (1985).

excused per Petitioner's motion.  *See Record Proper 99-2174* at 76; *Record Proper 00-1029* at 30.

Judge Richard Knowles was then assigned in one of the cases and signed the judgment for Judge Dal Santo that entered in both cases on March 19, 2001.  Although he was not originally assigned the companion matter, Judge Knowles in fact took care of any orders that arose in either case.  Eventually he was assigned to the companion matter as well.  *See Record Proper 99-2174* at 77, 83-87; *Record Proper 00-1029* at 35-39, 61.

While these reassignments were taking place, a new attorney, Gail Prosser, entered her appearance on behalf of Petitioner, and Robinson and Schoeppner were permitted to withdraw.  *See Record Proper 99-2174* at 79, 81, 95-108; *Record Proper 00-1029* at 33, 47-58.

## *I.  Motion To Reconsider Before Judge Knowles*

Prosser asked Judge Knowles to reconsider Petitioner's sentence and Judge Knowles scheduled a hearing.  *See Record Proper 99-2174* at 89-93; *Record Proper 00-1029* at 41-45.  At the May 14, 2001 hearing, Davis informed the Court of the impact Salaz' behavior has had on her and Sharon.  *Reconsideration* at 45-48.  Davis' father addressed the Court as well.  *Id.* at 50-51.

Prosser, however, again emphasized Petitioner's readiness to admit what he did and accept responsibility for the crimes in order to avoid further trauma to Sharon.[10]  Petitioner

---

[10]  She addressed the Court at length on this point, beginning her argument by saying:

> Mr. Salaz has taken responsibility for his actions in this case.  ***At the time that this case was pending he told his former counsel that he didn't want to do any motions, didn't want to go to trial, didn't want to put this victim through anything further.***  He pled guilty.  He didn't plead no contest, he pled guilty, and he pled guilty to almost the entire indictment in the case . . . .

21

emphasized the same thing.[11]  And, this time, Dr. Aubrey personally testified about his

recommendation for sentencing and explained his findings discussed above.

When the prosecutor cross-examined Dr. Aubrey, she addressed the last two pages of his

report.  She found it "particularly troubling" Dr. Aubrey would tell the Court that Petitioner "is

very unlikely to re-offend" when the "statements made on the last two pages clearly, clearly

convey a sense of concerns not only about future possible behavior, but also about behavior which

either has taken place in Mr. Salaz's past that is criminal or that might be taking place during Mr.

Salaz's period of treatment."  *Id.* at 17.  Dr. Aubrey explained that he did not want his report to

the Court to give the impression that he believed Petitioner would ***never*** offend in the future.  But

he was also of the opinion that Petitioner was a low risk for reoffending and amenable to

treatment on the outside that he would not receive while in prison.[12]

---

*Reconsider Sentence* at 3 (emphasis added); *see also id* at 3-5.

[11]  Petitioner told the Court:

> I thank the Court for giving me a reconsideration hearing.  I believe the
> United States has a terrific court system.  I sincerely apologize to all the
> victims involved and I am very, very sorry for having offended the
> victims.  I take it upon myself as my responsibility and my responsibility
> alone that I have offended them and I regret it.  I will regret it the rest of
> my life and I am very, very sorry, sir, for having offended these people.

*Id.* at 43.

[12]  His comments on this point were as follows:

> Well, I do with any person who is charged with a sexual offense against a
> child have concerns that we need to be aware that any of them have the
> potential to re-offend, and at the same time, Mr. Salaz, despite his
> problems, in comparison with other with other (sic) sex offenders tends to
> be at lower risk than they are.  Given his problem behavior, including the
> offense but not limited to that seems to be more of a reaction to issues and
> opportunities and situations that arose without his orchestrating in a

22

Like Chambreau's testimony at sentencing, Dr. Aubrey also advocated imposing as short a term of incarceration as possible because of the lack of treatment available in prison.[13]

Chambreau also addressed the Court at length during the reconsideration hearing,

---

thoughtful manner.  He needs a fairly high degree of structured supervision in order to help him reform.  Some of the comments are in regards to the issue that his therapist, if he eventually is in the community or has the opportunity to be, could lead to the problem.  His therapist needs to be aware that this is a man who will need to be guarded very closely and the recommendation for polygraph is a routine recommendation, and in his case it's simply to help keep him accountable and for him to know that there won't be any deviation from the structured boundaries, that this therapist will help him define what we call a relapse prevention plan.

So, yes, I do have concerns.  I've tried to outline them because I wouldn't want the Court to get the impression that this is a man who has no potential to ever have further problems.  I think he does have a potential for further problems, but he isn't – despite that, he isn't a person who is categorized as being at high risk.  If anything, low risk . . .

*Id.* at 17-19.

[13]     One of the concerns I have regarding Mr. Salaz in particular is that the longer he remains incarcerated, I think that his personality functioning is such that he will probably deteriorate to some extent while incarcerated and that when he is eventually released that treatment with him will be more challenging than it would be if his treatment were to have started relatively soon, so that starting sooner rather than later is going to be of more benefit to him and to the extent that we can treat Mr. Salaz for this problem that's protective of the community, because our research shows that people who are successfully treated have lower rates of recidivism than to offenders who weren't provided treatment, and the concern I have right now is corrections just does not provide that, which is unfortunate.  They used to – they had a good reputation for their in-house treatment programs, but they've been discontinued as of several years ago.

So my recommendation is to consider the earliest possible time to begin Mr. Salaz' rehabilitation, which by necessity won't start until he's released from incarceration, and his treatment needs to be focused on sexual or personality disturbance.

*Id.* at 10-11.

23

reiterating his prior testimony.  Chambreau also told the Court that he was "traumatized" by the sentence Salaz received because "here we have a defendant who's been evaluated . . . low to moderate.  I have people in my program that have been classified . . . moderate to high which makes them a lot more dangerous than Mr. Salaz is and they got probation.  I've seen clients that have done far worse that Mr. Salaz . . . get a lot less time or no time at all."  *Id.* at 36-37.  He again stressed that if Petitioner was sentenced for a long time, then the "window of opportunity" for treatment would be lost and, upon his inevitable release, Petitioner would be "extremely hard to treat."  *Id.* at 37; *see also id.* at 38-40.  He further advised the court that the sex offender monitoring unit has more staff, uses GPS monitoring, and has good success with no reoffenses. *See id.* at 32-33.

In addition to the above testimony, Judge Knowles thoroughly reviewed the presentence report and the sentencing transcript before issuing his decision.  *See id.* at 51-54.  Although he believed the defense had "good issues on rehabilitation," he also considered retribution, deterrence and incapacitation justifications for sentencing.  *Id.* at 66.  Judge Knowles found that "Mr. Salaz will say different things at different times, depending on his perceptions of what will come across best."  *Id.* at 65.  Considering the vulnerability of children and the fact that Sharon felt safer knowing Petitioner was to be incarcerated for a long time, he declined to change Judge Dal Santo's sentence.  *See id.* at 63-66.

# II.  Analysis – Procedural Considerations

## A.  *Grounds For State Habeas Relief*

Petitioner did not appeal Judge Knowles' May 14, 2001 decision on reconsideration. Instead, some five months after his time to appeal expired, Salaz filed a *pro se* petition for a writ of habeas corpus on October 19, 2001.  *See Record Proper 99-2174* at 117.  He raised four issues.[14]

On December 28, 2001, Judge Knowles set an evidentiary hearing on the first issue and

---

[14]  They provided in full:

> [1]  My severe anxiety and depression coupled with my stress disorder caused me to believe that the court was going to give me probation and 0-4 years incarceration.  I was told that by Mr. Schoep[p]ner.  My medication had stopped pending a new prescription renewal.  I now feel that my plea agreement was unlawfully induced, and that I did not understand the consequences of my plea agreement.

> [2]  All character evidence was not presented on my behalf.  I had supervised visitation reports to support my character of being a good person (see APN notes).  The character witnesses at both of my hearings were not allowed to speak on my behalf.

> [3]  False accusations by the prosecution abounded plenty but my attorneys did not allow me to give a refutation or objection to them.  The most damaging one is the accusation of sex with Sharon.

> *     *     *     *     *

> [4]  I was denied effectual counsel because my attorneys did not present any discovery materials to me on the S.O. case and parts of the assault case.  The self-defense and child protection tactics that I used in the assault case were not presented on my behalf.  I was not portrayed as a victim of greed and wantonness in both cases.  Mr. Robinson and Mr. Schoep[p]ner confused me more than helped me because of their lack of information that I needed to make a plea agreement most fitting to me.

*Record Proper 99-2174* at 120-21.

appointed counsel. His order noted that he would permit the other three issues to be addressed if defense counsel argued them. *Id.* at 135-36. Attorney Sophie Cooper of the New Mexico Public Defender Habeas Conflict Unit entered her appearance on behalf of Petitioner on January 8, 2002, and moved to continue the hearing. *Id.* at 137, 140.

After resolving evidentiary and privilege issues, Judge Knowles required Cooper to file a "consolidated" habeas petition, that addresses "all issues that Defense wishes to pursue in this petition for writ of habeas corpus" and that "explicitly" stated "which issues you are abandoning." *Habeas Motion* at 26; *see also id.* at 22-23; *Record Proper 99-2174* at 142-49; *Record Proper 00-1029* at 70-75, 81-82.

Cooper winnowed the issues to the claim that Petitioner's plea was involuntary due to ineffective assistance of counsel. She specifically noted that Petitioner was "abandoning the issue of COMPETENCY TO STAND TRIAL (OR ENTER A PLEA AGREEMENT)." *Record Proper 99-2174* at 150 (emphasis original); *Record Proper 00-1029* at 83 (emphasis original). The sole issues presented for state habeas relief by counsel were:

> [1] Petitioner contends that his plea was involuntary, having been induced by a false promise from his attorneys concerning sentencing exposure.
>
> [2] He also maintains that he received ineffective assistance of counsel, rendering his plea involuntary and unknowing.

*Record Proper 99-2174* at 150; *Record Proper 00-1029* at 83. For relief, she requested Judge Knowles to vacate the conviction and set the case for trial. *Record Proper 99-2174* at 155; *Record Proper 00-1029* at 88.

On agreement of the parties, subsequent evidentiary proceedings were bifurcated along the

26

two-prong federal *Strickland* analysis:

> in this case, the parties agreed to a bifurcated hearing.  The Court
> was first to determine whether the attorney's representation fell
> below the standard of reasonably competent counsel.  If the Court
> found this, then the State would facilitate interviews between
> habeas counsel and potential "fact" witnesses in the case and there
> would be a second evidentiary hearing to determine whether
> petitioner was prejudiced by his attorneys' incompetent
> performance.

*Record Proper 99-2174* at 220; *Record Proper 00-1029* at 147.  Further, the State and Judge

Knowles identified *Strickland* test as the "seminal" applicable standard for ineffectiveness of

counsel.  *See Robinson Habeas Testimony* at 11; *Habeas Motion* at 24.

## B. *Competency Claim Is Not, And Cannot, Be Raised Here*

After Respondents answered the federal petition now before me, I entered orders

requesting them to file additional materials.  S*ee Docs. 10, 11.*  Thereafter, Salaz returned to state

court with a second *pro se* habeas petition where he asserted that he was incompetent to enter the

plea due to incarceration and antidepressant medication.  *See Doc. 12,* Exh. I ("Additional Pages

To Ground One" at 1-3).  Judge Knowles immediately denied the petition on the ground that it

had already heard the same arguments and ruled on them.  *See id,* Exh. J.  As illustrated above,

however, in fact Petitioner ***abandoned*** this claim during the first round of state habeas

proceedings and Judge Knowles never discussed a competency claim in his findings.  The New

Mexico Supreme Court denied *certiorari.  See Doc. 13,* Exhs. L-M.

Petitioner has not sought to assert the incompetency claim here.  Furthermore, he could

not.  Federal proceedings do not toll the one-year statute of limitations, nor does the filing of the

second state petition commenced after the limitations period[15] expired.  *See Duncan v. Walker,* 533 U.S. 167 (2001); *Lovato v. Suthers,* 42 Fed.Appx. 400, 402 (10th Cir. 2002).  Consequently, Salaz could not now amend the federal petition to assert the entirely new competency claim.  *See Woodward v. Williams,* 263 F.3d 1135, 1142 (10th Cir. 2001), *cert. denied,* 535 U.S. 973 (2002); *United States v. Espinoza-Saenz,* 235 F.3d 501, 505 (10th Cir. 2000).

### *C.  Procedurally-Defaulted Claims*

As in the state habeas proceedings, Salaz first contends that his plea was involuntary because his attorneys promised a certain sentence.  Secondly, he maintains that he was denied ineffective assistance of counsel by their failure to investigate the abuse case and this prevented him from making an informed decision as to a plea.  *See Doc. 1* at 5; *see also id.* ("Statement of Supporting Facts" at 1).  However, the federal petition goes on to further claim that Petitioner's trial attorneys were ineffective for a host of other failures and that Prosser was ineffective for a number of reasons.  *See id.* ("Statement of Support Facts" at 10-12).  With regard to these new claims, Petitioner either raised them in his first *pro se* state habeas petition and abandoned them, *see supra* § II.A., or has never raised them in state court.

None of the State's three Answers raise the issue of procedural default.  *See Doc. 14,* ¶ 4; *see also Docs. 15, 22.*  Nonetheless, this Court has discretion to raise the issue of procedural default *sua sponte,* and I do so here.  *See e.g., Hardiman v. Reynolds,* 971 F.2d 500, 505 (10th Cir. 1992); *c.f.,* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the

---

[15]   By a generous calculation, Petitioner's sentence became final on June 13, 2001, or thirty days after his motion to reconsider sentence was denied.  The statute ran unabated for 128 days until October 19, 2001 when he filed his first state habeas petition.  The statute was tolled until the habeas proceedings concluded with the denial of certiorari on August 7, 2003.  The one-year statute thus expired on April 5, 2004, and Petitioner's second state habeas petition was filed more than a month after that date.

exhaustion requirement or be estopped from reliance upon the requirement unless the State,

through counsel, expressly waives the requirement.").

The federal habeas exhaustion and procedural default doctrines are related to comity

concerns.  The State should first be presented with the opportunity to rule on any federal

constitutional issues that implicate the validity of a conviction.  *E.g., Edwards v. Carpenter,* 529

U.S. 446, 451 (2000); *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999).   In New Mexico,

issues that are abandoned at the trial level are deemed waived.  *See, e.g., Maes v. Thomas,* 46

F.3d 979, 986 (10th Cir.) ("New Mexico courts have consistently applied the rule that deems all

issues abandoned that are not raised in an appellant's brief-in-chief"), *cert. denied,* 514 U.S. 1115

(1995).  Furthermore, "New Mexico courts will not consider any issues raised in a second post-

conviction proceeding which could have been raised in the first proceeding."  *Harris v. Williams,*

5 Fed. Appx. 831, 2001 WL 201962 (10th Cir. 2001).  The "narrow exception to the New Mexico

waiver rule [is] when the petitioner asserts 'fundamental error' in his trial."  *Id.* (citing *State v.*

*Gillihan,* 86 N.M. 439, 524 P.2d 1335, 1336 (N.M. 1974)).  Moreover, the

> doctrine of fundamental error should be applied sparingly, to
> prevent a miscarriage of justice, and not to excuse the failure to
> make proper objections in the court below.  With regard to a
> criminal conviction, the doctrine is resorted to only if the
> defendant's innocence appears indisputable or if the question of his
> [or her] guilt is so doubtful that it would shock the conscience to
> permit the conviction to stand. . . .  "If there is substantial evidence
> . . . to support the verdict of the jury, we will not resort to
> fundamental error."

*State v. Reyes,* 52 P.3d 948, 962, 2002-NMSC-024 (N.M. 2002) (citations and original material

omitted).

The new claims Salaz raises in his federal petition are thus procedurally defaulted and I may only address them if he "establishes either cause for the default ***and*** actual prejudice ***or*** a fundamental miscarriage of justice if the merits of the claim are not reached." *Demarest v. Price,* 130 F.3d 922, 942 (10th Cir. 1997) (emphasis added); *see also e.g., Johnson v. Champion,* 288 F.3d 1215, 1217 (10th Cir. 2002).

As for the first alternative, Petitioner fails to show cause. To establish cause, he must demonstrate that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986); *see also e.g., id.* at 489; *Shayesteh v. City of South Salt Lake,* 217 F.3d 1281, 1283 (10th Cir. 2000), *cert. denied,* 531 U.S. 1171 (2001). None exists on the face of the voluminous record I reviewed and Salaz does not assert any. Furthermore, representation by Cooper in post-conviction proceedings is of no consequence, because Salaz is not constitutionally entitled to counsel in post-conviction proceedings. Hence, habeas counsel's ineffectiveness cannot provide the basis for finding cause for the procedural default.[16]

As for the second alternative, the federal fundamental miscarriage of justice exception to the procedural default doctrine "is intended for those rare situations where the State has convicted the wrong person of the crime. . . . [Or where] it is evident that the law has made a mistake." *Klein v. Neal,* 45 F.3d 1395, 1400 (10th Cir. 1995) (internal quotations and citation omitted).

---

[16] *See United States v. Harms,* 371 F.3d 1208, 1212 (10th Cir. 2004) ("This court has also recognized that counsel's failure to recognize a potential legal argument does not constitute cause for a procedural default. *Hopkinson v. Shillinger,* 954 F.2d 609, 610 (10th Cir. 1992)."); *Martinez v. Johnson,* 255 F.3d 229, 241 (5th Cir. 2001) (and decisions from the 4th, 8th, 9th, and 11th Circuits cited therein), *cert. denied,* 534 U.S. 1163 (2002); *Body v. Watkins,* 51 Fed. Appx. 807, 811 (10th Cir. 2002) ("we also agree with the district court that the conduct of Mr. Body's counsel, even if ineffective or neglectful, cannot excuse his failure to exhaust state remedies").

Only "factual innocence" will meet the demanding standard; "legal innocence" will not suffice.[17]

Petitioner's admissions of guilt to his attorneys and during the plea colloquy render those

exceptions inapplicable.[18]  Accordingly, I confine my substantive analysis to the two claims that

were raised before Judge Knowles during the habeas proceedings.

# III.  Substantive Analysis

## A.  Judge Knowles' Findings

Judge Knowles' written findings reflect his oral findings.[19]  As for the voluntariness of the

---

[17]  *E.g., Beavers v. Saffle,* 216 F.3d 918, 923 (10th Cir. 2000); *State v. Cunningham,* 128 N.M. 711, 714,  998 P.2d 176, 179 (N.M. 2000) ("Further, *Garcia* emphasized that this Court should 'exercise this discretion very guardedly, and only where some fundamental right has been invaded, and ***never in aid of strictly legal, technical, or unsubstantial claims***' . . . This early case established important principles that provide the foundation for our analysis of Cunningham's [fundamental error] claim.") (emphasis added).

[18]  *E.g., Ellis v. Mullin,* 56 Fed. Appx. 858, 865 (10th Cir. 2003) ("at his plea hearing he stated under oath that he committed the acts alleged in the information, which he stated he had gone over with his attorney. . . . Ellis pled "guilty," not nolo contendre.  He has not made a colorable claim of factual innocence."); *United States v. Simpson,* 32 Fed. Appx. 507, 509 (10th Cir. 2002) ("Mr. Simpson admits that he was a felon who possessed a firearm and his defense of necessity was waived by his unconditional guilty plea. He has not made a colorable showing of factual innocence, and thus cannot establish a fundamental miscarriage of justice."); *Wiggins v. Moriarty,* 1998 WL 244028 (10th Cir. 1998) (petitioner claimed plea was involuntary, Tenth Circuit held claim procedurally defaulted and did not fall within New Mexico fundamental error exception because New Mexico Court of Appeals determined plea was voluntary); *c.f., State v. Steven B.,* ___ N.M. ___, ___ 94 P.3d 854, 862 (N.M. App. 5/27/04) (certiorari denied 7/8/04) ("we note that the record indicates that Gabriel entered into his plea knowingly, voluntarily, and with the advice of counsel.  In so doing, he received the benefit of dismissal of the charge of arson.  As such, he may not now challenge the sufficiency of the evidence.").

[19]  At the evidentiary hearing, Judge Knowles discussed at length why he found both claims without merit.  He found that the plea not induced by a "guarantee" by Robinson of a specific sentence because:  both Salaz and Schoeppner testified that there was no guarantee;  Robinson only characterized his statements to Salaz as an iron-clad guarantee on cross-examination; and all were in accord in their testimony that they realized the plea could result in a fifty-year sentence but were hoping for less.  *See Petitioner Habeas Testimony* at 107-09.

He found the plea voluntary because he gave heavy weight to Petitioner's representations on the record to Judge Dal Santo at the time of the plea.  Moreover, despite the opportunity to do so, Petitioner

plea, he found:

> that the plea was voluntary and was not induced by counsel's promise of a sentence below the 'cap' contained in the plea agreement. Although attorney Shannon Robinson testified that he guaranteed Sala[z] a sentence of 4 to 6 years, co-counsel John Schoeppner and petitioner Juan Sala[z] testified that no such promise was made. Juan Sala[z] testified that he understood he could get 'hammered' but that his attorneys repeatedly told him not to worry, he would get probation or 'zero to four' incarceration. Also, during the plea proceeding, judge Dal Santo reviewed the written terms of the plea agreement exposing him to zero to sixty years in prison with a fifty year 'cap' at initial sentencing. During this plea colloquy, Sala[z] said he understood he could receive up to fifty years' imprisonment at initial sentencing and he also told Judge Dal Santo that he hadn't been made any promises other than those continued in the written plea agreement.

*Record Proper 99-2174* at 220; *Record Proper 00-1029* at 147.

As for whether counsel's conduct was reasonable, he found that

> the attorneys' representation did not fall below the standard of a (sic) reasonably competent representation. The attorneys were very concerned that if the child rape case (CR 99-2174) proceeded to trial, petitioner would testify that he had sexual contact with the twelve year old child because she was sexually aggressive towards him. This is not a legal defense to the sexual contact and penetration charges and would, in fact, be strong evidence of guilt. For this reason, the attorneys determined early on that they would work towards lessening the sentence, rather than investigating the charges. The attorneys testified that they did not even look at the Safehouse interview given by the child victim nor listen to her

---

never indicated during plea, sentencing, or reconsideration proceedings that he had been promised a certain sentence. *See id.* at 108-110, 112-13.

Judge Knowles also found that counsel's strategic decision to focus on mitigating the sentence was reasonable given the information they had at the time: the police report containing the allegations by Davis and Sharon, Petitioner's repeated assertions that he wanted to testify coupled with his position that the child entrapped him into committing the abuse, and Robinson's initial impression that Sharon was credible given his brief meeting with her. Further, it was pure speculation that a different strategy would have been pursued had the attorneys reviewed the Safe House video. *See id.* at 111-114.

> mother's tape-recorded statement to police.  Mr. Robinson testified that a few weeks prior to the rape allegations, he had met briefly with the child when Sala[z], the child and her mom had visited his office in reference to another case.  At that time, Robinson's impression was that the child was credible.  The attorneys also testified that they told petitioner he could expect to be sentenced in between four and ten or twelve years imprisonment.  Both attorneys agreed that they had little or no experience with the assigned judge in sentencing on these kind of cases.  Given the facts and circumstances of petitioner's cases, advising petitioner to plea guilty pursuant to the plea agreement, not investigating the rape case, and telling petitioner that he would likely receive prison sentence well below the plea's fifty year cap, was not below the standard of reasonably competent representation.

*Record Proper 99-2174* at 220-21; *Record Proper 00-1029* at 147-48.

## B.  AEDPA Standards Of Review

Reviewing a petition through the "lens" of AEDPA, a federal court cannot grant a writ of habeas corpus unless:  (1) the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" Supreme Court precedent; or (2) is "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. §§ 2254(d)(1)-(2).  The Supreme Court has construed the proper application of these statutory provisions over the course of several recent opinions, which I discuss in more detail below.  *See Mitchell v. Esparza,* ___ U.S. ___, 124 S. Ct. 7 (2003) (*per curiam*); *Wiggins v. Smith,* ___ U.S. ___, 123 S. Ct. 2527 (2003); *Price v. Vincent,* 538 U.S. 634, 123 S. Ct. 1848 (2003); *Lockyer v. Andrade,* 538 U.S. 63 (2003); *Woodford v. Visciotti,* 537 U.S. 19 (2002) (*per curiam*); *Early v. Packer,* 537 U.S. 3 (2002) (*per curiam*), *rehearing denied,* 537 U.S. 1148 (2003); *Bell v. Cone,* 535 U.S. 685 (2002); *Williams v. Taylor,* 529 U.S. 362 (2000); *see also Miller,* ___ F.3d ___, 2004 WL 96739 (10th Cir. 2004).

33

### C.  Clearly Established Supreme Court Precedent
### Governing Voluntariness And Ineffectiveness

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in § 2254(d)(1) "'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Lockyer,* 538 U.S. at 71 (quoting *Williams,* 529 U.S. at 412).

Under clearly established Supreme Court precedent, the "test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative course of action open to the defendant." *Hill v. Lockhart,* 474 U.S. 52, 56 (1985) (internal quotations and citations omitted).  Furthermore, "the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison,* 431 U.S. 63, 73-74 (1977).

It is equally clearly established that where the basis for challenging a plea as involuntary rests on a claim of ineffective assistance of counsel, a modified version of the *Strickland* standard applies.  That is, a habeas petitioner must first establish that counsel's conduct was objectively unreasonable and, second, that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* at 59; *see also id.* at 57-58; *United States v. Salazar,* 323 F.3d 852, 857 (10th Cir. 2003).  Because the test is two-pronged, if either prong is not met, it is unnecessary to discuss the other. *E.g., Hill,* 474 U.S. at 60.

### D.  Judge Knowles Did Not Identify Contrary Standards
### For Voluntariness Or Ineffectiveness

A state decision is "contrary to" Supreme Court precedent if it "'applies a rule that contradicts the governing law set forth in [those] cases.'"  *Price*, 538 U.S. 634, ___, 123 S. Ct. at 1853 (quoting *Williams*, 529 U.S. at 405).  However, a decision is not "contrary to" "simply because the [state] court did not cite [Supreme Court] opinions. . . . [A] state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'"  *Mitchell*, ___ U.S. ___, 124 S. Ct. at 10 (quoting *Early*, 532 U.S. at 8); *see also Miller*, ___ F.3d. ___, ___, 2004 WL 96739 at *3-4 (federal court applies AEDPA standard "notwithstanding the [state courts'] failure to cite or discuss federal case law.").

Here, it is plain from the arguments made by the parties and the judge both in their written submissions and discussion during the evidentiary hearings, that Judge Knowles applied the familiar voluntary/intelligent and unreasonable/prejudice tests to the matter before him.[20] Accordingly, the state court decision does not run afoul of clearly established Supreme Court precedent within the first meaning of § 2254(d)(1).

### E.  Judge Knowles Did Not Unreasonably Determine
### The Historical Facts Underlying His Legal Analysis

A state decision rests on an "unreasonable determination of the facts" where it is shown by

---

[20]  *See, e.g., Record Proper 99-2174* at 154-55 (identifying identical two-prong test for ineffectiveness in context of guilty plea but citing state cases); *id.* at 167-68 (discussing valid plea must be knowingly and voluntarily made, but citing state law; citing federal law for proposition that solemn declarations in open court refute claims of unkept promises and misunderstandings; also discussing reasonableness prong but citing state law); *id.* at 220-21 (Judge Knowles' written decision); *Record Proper 00-1029* at 147-48; *Robinson Habeas Testimony* at 11 (oral argument re: applicable standards); *Petitioner Habeas Testimony* at 60-114 (same, with Judge Knowles questioning and findings).

"clear and convincing evidence," 28 U.S.C. § 2254(e)(1), that the factual finding is erroneous. *Wiggins* ___ U.S. ___, 123 S. Ct. at 2539; *see also e.g., Toles v. Gibson,* 269 F.3d 1167, 1182 (10th Cir. 2001) (findings of historical fact entitled to presumption of correctness unless overcome by clear and convincing evidence), *cert. denied,* 538 U.S. 948 (2003).

Several factual findings underlie Judge Knowles' decision, a key one being that Petitioner's attorneys did not "guarantee" Salaz a particular sentence.  While Judge Knowles did not specifically find Robinson's testimony on cross-examination about a guarantee to be untruthful, plainly he did not give the assertion controlling weight in light of the conflicting testimony to the contrary.

Other than his unsupported and conclusory assertions to the contrary, Petitioner does not submit any clear and convincing evidence to conclude that the lack of a guarantee finding is erroneous.  In fact, Salaz admits that he testified before Judge Knowles that his attorneys made "no guarantee," but now alleges that he "failed to tell Judge Knowles on June 10, 2003, that the final statement before court by [Robinson] to petition was that he would receive 0-4 years with probation." *See Doc. 1* ("Statement of Supporting Facts" at 13).

The latter assertion about what he failed to tell Judge Knowles is flatly contradicted by the record.  Petitioner's state habeas testimony is replete with statements about Robinson's "0-4 year" representation, and with acknowledgments that Schoeppner's guess was ten to fifteen years.  The record overwhelmingly indicates that Petitioner fully understood there was no guarantee and that he could receive fifty years under the terms of the plea agreement. *See Petitioner Habeas Testimony* at 19-29, 36-38, 41-42.  Accordingly, Judge Knowles' finding that petitioner understood there was no guarantee is not unreasonable within the meaning of 28 U.S.C.

§§ 2254(d)(2) and is presumed correct under 28 U.S.C. § 2254(e)(1).

Another key factual finding Judge Knowles made was, to paraphrase, that the attorneys' strategy to mitigate the sentence rather than launch an investigation and take the case to trial constituted a reasonable tactic given that Petitioner admitted sexual contact but insisted that he was the victim and Sharon was the sexual instigator. *E.g., Record Proper 99-2174* at 221. Again, despite the contradictory and hair-splitting assertions in his testimony and petition that he did not "admit" penetration to Robinson, this finding also is supported by the record. Indeed, as in the state proceeding, Petitioner admits to certain contact, but insists that it was misconstrued or accidental because Sharon was the instigator. *E.g., Robinson Habeas Testimony* at 25, 29-33, 53-54, 70-74; *Schoeppner Habeas Testimony* at 10-11, 17, 21-22, 47-49, 52, 58-63, 67-68, 70; *Petitioner Habeas Testimony* at 15-17, 34-35, 37, 40; *Doc. 1* ("Statement of Supporting Facts" at 7-9). Accordingly, Judge Knowles finding that the "mitigation tactic was based on admissions and insistence of a legally indefensible position" is not unreasonable within the meaning of 28 U.S.C. §§ 2254(d)(2) and is presumed correct under 28 U.S.C. § 2254(e)(1).

## F.  Judge Knowles's Conclusions On Voluntariness And Ineffectiveness Are Not "Objectively Unreasonable Applications"

A state decision will also be found "contrary to" Supreme Court precedent if it "'confronts a set of facts that are materially indistinguishable from a decision . . . and nevertheless arrives at a result different [from the decision].'" *Price,* 538 U.S. 634, ___, 123 S. Ct. at 1853 (quoting *Williams,* 529 U.S. at 406). I have found no Supreme Court authority for the proposition that

persuading a similarly situated client[21] by predicting that a light sentence is a possibility, amounts either to coercion that vitiates the solemn declarations under oath at a plea hearing or to ineffectiveness for failure to investigate.

A state decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413. However, "it is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court" applied  "clearly established federal law erroneously or incorrectly." *Lockyer,* 538 U.S. at 75-76 (internal quotations and citations omitted).  "Rather, that application must be ***objectively*** unreasonable."  *Id.* (emphasis added).

In light of historical facts that underlie Judge Knowles' legal conclusions, which are binding here, I find that his decision is not objectively unreasonable.  Indeed, the decision is consistent with Tenth Circuit precedent, and I would reach the same conclusion as Judge Knowles about voluntariness[22] and counsel's investigation [23] were I undertaking an independent review.

---

[21]  That is, a client who has no prior criminal record but is factually guilty of the most serious charges outlined in the police investigation report and insists he was the victim of a child's sexual advances, to forgo preparation for trial and to enter into a plea where the State has offered probation as an option and experts recommend a light sentence.

[22]  *E.g., Fields v. Gibson,* 277 F.3d 1203, 1215-16 (10th Cir.) ("The [state court found] 'The fact that the desired result was not reached in this case does not render defense counsel ineffective.' . . .  Since we concluded above that Burton and Wilson did not coerce Fields but merely 'strongly urged' him to do what they thought was in his best interest, we find this argument fails to demonstrate deficient performance. Accordingly, the OCCA's determination that there was 'nothing [in the record] to support [Fields's] claim that counsel's performance was deficient' was not [contrary to or unreasonable under AEDPA standards]"), *cert. denied,* 537 U.S. 1023 (2002); *Lasiter v. Thomas,* 89 F.33d 699 (10th Cir. 1996) (claim that " defendant pled guilty because he misunderstood the consequences of his plea [where] 'wholly incredible' in light of the detailed state court record [of the plea] and warranted summary dismissal of federal habeas petition without an evidentiary hearing; moreover "[t]his court has specifically states '[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutional deficient

Furthermore, under *Strickland,* counsel's conduct is not viewed in hindsight.  Schoeppner

testified as to the district attorney's policy of withdrawing any plea offer if the defense

interviewed or deposed a child victim.  Thus, the defense made an entirely reasonable tactical

decision in my view not to question Sharon to avoid jeopardizing the plea offer.  Petitioner's

attorneys thought they could persuade Judge Dal Santo to give a light sentence given Petitioner's

lack of a record and Dr. Aubrey's findings and Chambreau's position on sentencing.  Indeed,

---

performance rising to the level of ineffective assistance of counsel.'") (citation omitted); *Wellnitz v. Page,* 420 F.2d 935, 936 (10th Cir. 1970) ("a defendant's erroneous expectation, based on his attorney's erroneous estimate, likewise doe not render a plea involuntary"); *United States v. Gonzalez,* 98 Fed. Appx. 825 (10th Cir. 2004) (under *Wellnitz,* only "firm and reckless" assurance by attorney as specific sentence can qualify for ineffective assistance); *Kyler v. Foshee,* 90 Fed. Appx. 292, 298-99 (10th Cir. 2004) ("Although 'a valid guilty plea may not be obtained through coercion,'. . . [o]n habeas review, a federal court will 'uphold a state court guilty plea if the circumstances demonstrate that the defendant understood the nature and consequences of the charges and the defendant voluntarily chose to plead guilty.' . . .  As the Colorado Supreme Court found in its extensive review, all of the facts that shed light on the state of Kyler's mind at the time he pleaded guilty indicate that his plea was voluntary.  For example, during the plea colloquy process, Kyler stated at least seven times, twice in writing and five times orally, that he had not been coerced to enter his guilty plea. . . .  Kyler's plea shows that he was acting in a highly rational manner:  he had been advised by his attorney that he had little defense on the escape counts, which required consecutive sentences, and that he faced long potential sentences for the other counts involving the sexual abuse of children. . . .  By pleading guilty, Kyler was immediately able to reduce the number of counts for which he could have been convicted from fifteen to two. . . .  In this light, Kyler's plea bargain certainly appears to have been a 'voluntary and intelligent choice among the alternatives available' to him.).

[23] *E.g., Romero v. Tansy,* 46 F.3d 1024, 1029 (10th Cir.) (case where defendant pleaded guilty and later claimed he did so because counsel failed to investigate adequately; "The Sixth Amendment requires that counsel 'make reasonable investigations or make reasonable decisions that particular investigations are unnecessary.' . . . whether counsel's failure to investigate a possible defense was reasonable 'may be determined or substantially influenced by the defendant's own statements or actions.' . . . . [Counsel described investigation undertaken].  Importantly, James further testified that appellant told him that Ms. Montoya could not identify him because he was wearing a hat and sunglasses and because she could not see very well.  James inferred from this statement that appellant was at the crime scene and probably committed the robbery.  Finally, contrary to appellant's testimony, Mr. James testified that he did not remember appellant ever providing him the names of potential witnesses. . . . it was reasonable for Mr. James to infer from appellant's statement that appellant committed the offense.  "And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."  *Strickland,* 466 U.S. at 691), *cert. denied,* 515 U.S. 1148 (1995).

Judge Dal Santo was receptive to these arguments, and Judge Knowles considered the evidence as raising "good issues."   Only in hindsight did the strategy appear to be a mistake.  *E.g., Robinson Habeas Testimony* at 44-45, 59, 62, 74-76, 82; *Schoeppner Habeas Testimony* at  20, 41-42, 46-47, 50, 57, 59-60; *Petitioner Habeas Testimony* at 30-32.

Finally, Schoeppner stated that in hindsight, he should have approached Judge Dal Santo before the plea to ask her what sort of sentence she would impose.  However, in an interview with Cooper, Judge Dal Santo stated that while she was willing meet with defense counsel and the State to discuss matters in plea agreement cases, sometimes she would indicate a sentencing range she believed was appropriate and at other times refused to do so.  Judge Dal Santo could not speculate which approach she would have taken had Petitioner's attorneys approached her to ask about a range.  *See Petitioner Habeas Testimony,* Exh. 2 at 3, 5-6.

I further conclude that Petitioner was not "prejudiced" either.  I find it objectively unlikely that Sharon's comments about her grandmother during the Safe House interview would have led counsel to change their recommendation about pursuing a plea.  *See Hill,* 474 U.S. at 59-60.  Even if there was a basis to challenge Sharon's credibility, ultimately a jury would have to determine if a child would lie about sexual abuse.  Indeed, as Schoeppner was aware, attacking the veracity of an allegedly abused child is a risky tactic.  If Robinson, who encountered the child once for a short period of time thought Sharon came across as "nice" and "credible," then surely jurors could reach the same conclusion.  If Petitioner insisted on testifying and testified consistent with his belief that he was the victim, a position he persists in taking to this day, almost certainly the jury would have convicted him.  Given Petitioner's persistent adherence to his position, I doubt that his attorneys could have persuaded him to not take the stand.

Moreover, even aside from the Armijo assault charges and the numerous other sexual contact counts, Petitioner faced from at least thirty-six years and as much as fifty-four years in prison on the three sexual penetration counts charged in the indictment.  By pleading to ***attempted*** penetration, he cut that exposure in half.  *Compare Record Proper 00-1209* at 16, *with Record Proper 99-2174* at 43.

Wherefore,

**IT IS HEREBY RECOMMENDED** that the § 2254 petition be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten-day period  if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---


_____
UNITED STATES MAGISTRATE JUDGE